# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **RUSSELL W. BRANHAM,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:16cv00016 |
| | ) | |
| **NANCY A. BERRYHILL,**[1] | ) | **MEMORANDUM OPINION** |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | |
| Defendant | ) | BY: PAMELA MEADE SARGENT |
| | ) | United States Magistrate Judge |

## I. Background and Standard of Review

Plaintiff, Russell W. Branham, ("Branham"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that he was not eligible for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2011). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by transfer based on consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Oral argument has not been requested; therefore, the matter is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. Berryhill is substituted for Carolyn W. Colvin, the previous Acting Commissioner of Social Security.

reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "'substantial evidence.'"" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Branham protectively filed an application for DIB on September 6, 2012, alleging disability as of September 4, 2012, due to problems with his back, neck and lungs; breathing problems resulting from lung nodules; arthritis; hands swelling; depression; shoulder injuries; and difficulty standing for extended periods due to foot pain. (Record, ("R."), at 182-83, 205, 209.) The claim was denied initially and on reconsideration. (R. at 100-02, 109-16, 118-20.) Branham then requested a hearing before an ALJ. (R. at 121.) The ALJ held a video hearing on December 29, 2014, at which Branham was represented by counsel. (R. at 41-66.)

By decision dated January 30, 2015, the ALJ denied Branham's claim. (R. at 26-36.) The ALJ found that Branham met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2017. (R. at 28.) The ALJ found that Branham had not engaged in substantial gainful activity since

September 4, 2012, the alleged onset date.[2] (R. at 28.) The ALJ found that the medical evidence established that Branham had severe impairments, namely degenerative disc disease of the cervical/lumbar spine with radiculopathy in the right arm; chronic obstructive pulmonary disease, ("COPD"); obesity; and depression, but she found that Branham did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 28-29.) The ALJ found that Branham had the residual functional capacity to perform simple, routine, repetitive light work[3] that did not require him to crawl or climb ladders, ropes or scaffolds; that did not require more than occasional kneeling, crouching and climbing of ramps and stairs; that did not require him to use his right arm for frequent overhead reaching; that did not involve concentrated exposure to dust, chemicals, fumes, unprotected heights or dangerous equipment; that did not require him to have contact with the public; and that did not require him to have more than occasional interaction with supervisors and co-workers. (R. at 31.) The ALJ found that Branham was unable to perform his past relevant work. (R. at 34.) Based on Branham's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of other jobs existed in the national economy that Branham could perform, including jobs as an assembler, a garment folder and a packing line worker. (R. at 34-35.) Thus,

---

[2] Therefore, Branham must show that he became disabled between September 4, 2012, the alleged onset date, and January 30, 2015, the date of the ALJ's decision.

[3] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2016).

the ALJ concluded that Branham was not under a disability as defined by the Act, and was not eligible for DIB benefits. (R. at 35-36.) *See* 20 C.F.R. § 404.1520(g) (2016).

After the ALJ issued her decision, Branham pursued his administrative appeals, (R. at 21), but the Appeals Council denied his request for review. (R. at 1-6.) Branham then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2016). The case is before this court on Branham's motion for summary judgment filed January 18, 2017, and the Commissioner's motion for summary judgment filed February 9, 2017.

## II. Facts

Branham was born in 1968, (R. at 67), which classifies him as a "younger person" under 20 C.F.R. § 404.1563(c). Branham has an eleventh-grade education and past work experience as a construction worker and a tire changer. (R. at 62, 210.) Branham testified that he constantly suffered with back and neck pain. (R. at 54.) He stated that he was unable to lift more than a gallon of milk; walk more than five minutes; stand more than 20 minutes without interruption; or sit more than 30 minutes without interruption. (R. at 54-55.) He stated that his medications helped dull the pain, but never totally eliminated it. (R. at 54.)

Asheley Wells, a vocational expert, was present and testified at Branham's hearing. (R. at 62-65.) Wells was asked to consider a hypothetical individual of

Branham's age, education and work history, who was limited to simple, routine, repetitive light work that did not require more than frequent overhead reaching with his right arm; that did not require him to climb ladders, ropes or scaffolds or crawl; that did not require more than occasional climbing of stairs or ramps, kneeling or crouching; that did not require working around concentrated exposure to unprotected heights, dangerous equipment, dust, chemicals and fumes; and that did not require the individual to have contact with the public or more than occasional social interaction with co-workers and supervisors. (R. at 62-63.) Wells stated that the individual could not perform Branham's past work, but that jobs were available existing in significant numbers in the national economy that such an individual could perform, including those of an assembler, a garment folder and a hand packager. (R. at 63.)

Wells was asked to consider the same individual, but who would be limited to standing two hours a day. (R. at 63-64.) She stated that there would be jobs available at the sedentary[4] level that such an individual could perform, including jobs as an assembler, a cuff folder and a weight tester. (R. at 64.) She also stated that, should the individual be required to rest three hours a day, there would be no jobs that the individual could perform. (R. at 64.) Wells stated that all competitive employment would be precluded should the individual have no useful ability to deal with work stress or to demonstrate reliability. (R. at 64-65.)

_____

[4] Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking or standing is often necessary in carrying out job duties. Jobs are sedentary if walking or standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a) (2016).

In rendering her decision, the ALJ reviewed records from Jo McClain, Psy.D., a state agency psychologist; Dr. Michael Hartman, M.D., a state agency physician; Howard S. Leizer, Ph.D., a state agency psychologist; Dr. Walid Saado, M.D.; Dr. Wyatt S. Beazley, III, M.D., a state agency physician; Robert S. Spangler, Ed.D., a licensed psychologist; Dr. James Robert Snapper, M.D., a pulmonologist; Pulmonary Associates of Kingsport; Dr. David M. Ratliff, M.D.; Dr. Latisha Hilton, D.O.; Crystal Burke, L.C.S.W., a licensed clinical social worker; James Kegley, M.S., a counselor; Dr. Wael El Minaoui, M.D.; Duke University Medical Center, ("Duke"); Brandie Dotson, A.P.R.N., an advanced practice registered nurse; Dr. Jason Fogg, M.D.; and Dr. Roy Deel, D.O. Branham's attorney also submitted medical reports from Mountain View Regional Medical Center and Dr. Saado to the Appeals Council.[5]

The record shows that Dr. Walid Saado, M.D., saw Branham from 2008 through 2015 for COPD; lumbar or lumbosacral intervertebral disc degeneration; hyperlipidemia; hypertension; bipolar disorder; obstructive sleep apnea; benign prostatic hyperplasia; a lung mass; shortness of breath; basal cell carcinoma; attention-deficit hyperactivity disorder; fatigue; pneumocystosis;[6] bursitis; shoulder pain; left knee pain; chronic pain syndrome; depression; anxiety;

---

[5] Since the Appeals Council considered and incorporated this additional evidence into the record in reaching its decision, (R. at 1-6), this court also must take these new findings into account when determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.,* 953 F.2d 93, 96 (4th Cir. 1991).

[6] Pneumocystosis is defined as pneumonia that results from infection with *Pneumocystis carinii*, occurs frequently among immunologically compromised individuals, and is characterized by alveoli filled with a network of acidophilic material that enmeshes the organisms. *See* STEDMAN'S MEDICAL DICTIONARY, ("Stedman's"), 651 (1995).

hypogonadism;[7] mixed or unspecified drug abuse;[8] and dysthymia. (R. at 627, 630, 634, 637, 641, 643, 646-47, 653, 656, 685, 732-35, 773, 783, 791, 798, 807, 816, 823.) During this time, Branham complained of low back, neck and right shoulder pain; hypertension; anxiety; and depression. (R. at 626, 629, 633, 635, 640, 642, 645, 648, 654, 657, 772, 786-87, 793-94, 800-01, 809-10, 818-19, 825-26.) In December 2010, x-rays of Branham's shoulders were normal. (R. at 730.) In September 2011, a PET scan of Branham's skull base to mid thigh showed multiple well-defined lung nodules.[9] (R. at 322.) Dr. Saado routinely reported that Branham's examinations were normal,[10] with the exception of tenderness in Branham's back and shoulder. (R. at 626-27, 629-30, 633-34, 636-37, 640-43, 645-46, 653-54, 656-57, 772-73, 781-83, 789-91, 796-98, 804, 806-07, 813, 815-16, 821-23, 828.)

In August 2013, x-rays of Branham's chest showed bilateral pulmonary

---

[7] Hypogonadism is defined as inadequate functioning of the testes or ovaries as manifested by deficiencies in gametogenesis or the secretion of gonadal hormones. *See* Stedman's at 395.

[8] The diagnosis of mixed or unspecified drug abuse was given in February 2015 after Branham tested positive for phentermine. (R. at 778, 784-85.) During that visit, Branham became angry and threatened Dr. Saado after being told that he would not be prescribed Norco or Klonopin. (R. at 784.)

[9] In January 2014, a PET scan showed innumerable pulmonary nodules, many of which had minimal to mild increase of fludeoxyglucose, ("FDG"), activity and slow growth since 2011, possibly representing a slow-growing non-FDG avid tumor. (R. at 709.)

[10] It was noted that Branham was in no respiratory distress; he had normal breath sounds; he had full range of motion and muscle strength; normal gait; and negative straight leg raising tests. (R. at 626-27, 629-30, 633-34, 636-37, 640-43, 645-48, 653-54, 656-57, 772-73, 782-83, 789-91, 796-98, 813, 815-16, 821-23.)

nodules, probably related to old granulomatous disease, and metastasis or other malignancy could not be excluded.[11] (R. at 765.) In September 2013, Branham complained of low back and neck pain, shortness of breath, anxiety and depression. (R. at 648.) Branham had no respiratory distress and clear bilateral breath sounds. (R. at 648.) While Dr. Saado noted that Branham had a depressed affect and anxious mood and diagnosed dysthymia, (R. at 647), subsequent office visits revealed a normal mood and affect; intact memory; appropriate intellectual functioning; and appropriate thought content/perception. (R. at 627, 630, 634, 637, 641, 643, 646, 653, 656, 773, 783, 791, 798, 807, 816, 823.) Branham reported on numerous occasions in 2013 and 2014 that his symptoms of anxiety had improved. (R. at 626, 633, 636, 640, 642, 645, 654, 657.)

In February 2014, Branham reported difficulty sleeping, trouble concentrating and mood swings, but stated that his symptoms of anxiety had improved. (R. at 633.) Dr. Saado diagnosed dysthymia and bipolar disorder. (R. at 634.) In September 2014, Dr. Saado reported that Branham's COPD, anxiety and depression were controlled. (R. at 767-68.) Branham's lungs were clear to auscultation bilaterally with no wheezes, rhonchi or rales, and his breathing was unlabored. (R. at 770.) In November 2014, chest x-rays showed multiple bilateral nodular pulmonary opacities, and it was noted that coal worker's pneumoconiosis could not be excluded. (R. at 762-63.) In January and February 2015, Dr. Saado reported that Branham's mood was anxious, depressed and angry. (R. at 783, 791.) Dr. Saado found that Branham's memory was intact, he had appropriate

---

[11] In January 2014, a biopsy of Branham's lymph node showed no evidence of malignancy. (R. 706.)

intellectual functioning and appropriate thought content/perception. (R. at 783, 791.)

The record shows that Dr. Latisha Hilton, D.O., saw Branham from 2011 through 2013 for chest pain; right shoulder pain; hypertension; dyspnea; chronic pain; arthritis; hypogonadism; a lung mass; dyspnea; hypercholesterolemia; lumbar and cervical disc degeneration; low back pain; obstructive sleep apnea; bursitis; neck pain; coal worker's pneumoconiosis; and depression. (R. at 386, 389, 392, 396, 399, 403, 407, 410, 412, 416, 462, 468, 754, 758.) Diagnostic testing performed in 2011 and 2012 showed that Branham had multiple bilateral pulmonary nodules, (R. at 377, 380, 412, 419, 424); a negative stress test, (R. at 374); a transthoracic echocardiogram was normal, with the exception of mild tricuspid regurgitation, (R. at 375); a right upper lobe lung biopsy showed bronchial mucosa with mild chronic inflammation, (R. at 674); x-rays of Branham's right shoulder were normal, (R. at 372); x-rays of Branham's cervical spine showed degenerative changes, (R. at 373); an MRI of Branham's cervical spine showed multilevel disc degenerative disease, most prominent findings at the C5-6 vertebrae where broad-based protrusion eccentric to the right caused mild canal, thecal sac narrowing with effacement of the cerebrospinal fluid space ventral to the cord on the right side and moderate right C5-6 foraminal stenosis by an uncovertebral spur, (R. at 367-68); x-rays of Branham's lumbar spine showed degenerative changes, (R. at 434); and an MRI of Branham's lumbar spine showed mild spondylitic changes, mild narrowing of the neural foramen on the left side at the L3-L4 and L4-L5 levels and mild narrowing of the neural foramina on both sides of the L5-S1 level. (R. at 427.)

In August 2011, Branham complained of intermittent episodes of mild substernal chest pain caused by exertion and stress, low back pain and right shoulder pain. (R. at 414.) Dr. Hilton reported that Branham had no respiratory distress; normal respiratory rhythm and effort; and clear bilateral breath sounds. (R. at 415.) Branham had a normal gait; no clubbing, cyanosis or joint swelling; normal muscle tone and strength; and limited range of motion of the right shoulder. (R. at 415.) In October 2011, Branham reported that his pain was controlled with medication. (R. at 408.) In December 2011, Branham reported that he was doing "okay." (R. at 405.) He stated that he was tolerating his medications without any issues and that his pain was stable. (R. at 405.)

In February 2012, Branham stated that his right shoulder pain improved with his last injection. (R. at 401.) Dr. Hilton diagnosed bursitis, hypertension, neck pain and hypercholesterolemia. (R. at 403.) In April 2012, Branham reported that he tolerated his pain medications, but requested that they be increased. (R. at 397.) In June 2012, Branham stated that he had to cut wood all year to ensure that his father had wood for the winter. (R. at 394.) He complained of back pain and requested an injection. (R. at 394.) Dr. Hilton reported that Branham had a normal gait; tenderness with palpation of the paraspinous muscles of the back; and muscle spasm on the right. (R. at 396.) In August 2012, Branham reported that he "get[s] a lot of exercise with his daily activities." (R. at 386.) He continued to report back pain. (R. at 386.) Dr. Hilton reported that Branham had no respiratory distress; normal respiratory rhythm and effort; and clear bilateral breath sounds. (R. at 388.)

In April 2013, Branham's physical examination was normal, and Dr. Hilton diagnosed coal worker's pneumoconiosis, hypertension, hypercholesterolemia and obstructive sleep apnea. (R. at 461-62.) In July 2013, Branham complained of shortness of breath on exertion. (R. at 752.) Dr. Hilton reported that Branham had no respiratory distress; normal respiratory rhythm and effort; and clear bilateral breath sounds. (R. at 754.) She reported that Branham had a depressed mood, but his insight and judgment were intact. (R. at 754.) Dr. Hilton diagnosed hypertension; coal worker's pneumoconiosis; obstructive sleep apnea; depression; and chronic pain. (R. at 754.)

On September 21, 2011, Branham was seen by Dr. Wael El Minaoui, M.D., a pulmonologist at Pulmonary Associates of Kingsport, for complaints of shortness of breath with occasional coughing. (R. at 313-15.) He denied depression or bipolar disorder. (R. at 315.) Dr. Minaoui reported that Branham's pulmonary examination revealed good air entry bilaterally that was clear to auscultation. (R. at 314.) The remainder of the examination showed a normal gait; no sensory deficits; and good muscle power. (R. at 314.) A pulmonary function study showed moderate obstruction with good post-bronchodilator response; moderate small airways disease, but no signs of air trapping on hyperinflation; and normal diffusing capacity of the lung for carbon monoxide. (R. at 348.)

On October 3, 2011, Branham complained of shortness of breath. (R. at 273-75.) He denied gait problems, depression or bipolar disorder. (R. at 274.) Dr. Minaoui reported that Branham's pulmonary examination revealed good air entry bilaterally that was clear to auscultation. (R. at 274.) The remainder of the

examination showed a normal gait and no sensory or motor deficits. (R. at 274.) Branham refused testing for sleep apnea. (R. at 275.) On October 7, 2011, a bronchoscopy was performed and showed bilateral secretions; inflamed mucosa bilaterally; extrinsic compression of the right middle lobe; extrinsic compression of the right upper lobe with almost complete narrowing of the airway; and narrowing in the anterior segment of the right upper lobe. (R. at 276-77, 279-83.) On December 19, 2011, Branham reported that he continued to have shortness of breath and that he used his inhalers. (R. at 304-05.) Branham stated that he did not want to continue doing any further investigations regarding his lung nodules. (R. at 304.) Dr. Minaoui noted that a CT scan of Branham's chest showed some improvement in the size of his lung nodules. (R. at 304.) Pulmonary examination showed good air entry bilaterally with no wheezing or rhonchi. (R. at 305.) Dr. Minaoui diagnosed moderate COPD, secondary to secondhand smoke or occupational pneumoconiosis; bilateral upper lobe nodules with negative PET scan; positive hemosiderin-laden macrophages, possible idiopathic pulmonary hemosiderosis; secondhand smoking; hypertension; and symptoms of obstructive sleep apnea. (R. at 305.) Branham again refused testing for sleep apnea. (R. at 305.)

On October 26, 2011, Dr. James Robert Snapper, M.D., a pulmonologist at Duke, saw Branham for an abnormal chest CT scan and x-ray. (R. at 567-69.) Branham complained of fatigue, frequent coughing and shortness of breath. (R. at 568.) Dr. Snapper reported that the etiology of Branham's abnormal CT scan and multiple pulmonary nodules was unclear. (R. at 568.) On January 22, 2014, Branham underwent a bronchoscopy, which was normal. (R. at 593-95, 739-42.)

On January 29, 2014, Dr. Snapper noted that it was probable that Branham's lung nodules represented pneumoconiosis. (R. at 738.)

On September 28, 2012, Dr. David M. Ratliff, M.D., saw Branham for complaints of pain in his back, neck, bilateral shoulders, right hand and left leg. (R. at 447-51.) Branham reported that pain medication relieved his pain. (R. at 452.) Examination of Branham's cervical spine showed tenderness with palpation and moderate pain with movement. (R. at 450.) Dr. Ratliff reported that Branham's memory was intact, and he demonstrated an appropriate mood and affect. (R. at 450.) Dr. Ratliff diagnosed degeneration of the cervical intervertebral disc; degeneration of the lumbosacral intervertebral disc; lumbar radiculopathy; and lumbosacral spondylosis without myelopathy. (R. at 450-51.) On October 22, 2012, Branham complained of pain in his back, neck, legs and shoulders. (R. at 495-500.) Brandie Dotson, A.P.R.N., an advanced practice registered nurse with Dr. Ratliff's office, reported that Branham's gait was antalgic; he had tenderness and limited range of motion of the cervical and lumbar spine; he had normal deep tendon reflexes; his memory was intact; and his mood and affect were appropriate. (R. at 498-99.) Dotson diagnosed lumbago; lumbosacral spondylosis without myelopathy; degeneration of the lumbar or lumbosacral intervertebral disc; radiculitis of the thoracic or lumbar; cervicalgia; cervical spondylosis without myelopathy; and degeneration of the cervical intervertebral disc. (R at 499.)

On November 20, 2012, Branham reported that his back pain was relieved with heat and pain medications. (R. at 504-09.) He stated that he was "doing well with medical control of the pain." (R. at 504.) Dr. Ratliff reported that Branham's

respiratory effort was normal; his gait was full weight bearing with no assistive device; he had tenderness in the cervical and lumbar spine with moderate pain with motion; he had normal strength in the bilateral upper and lower extremities; he had normal muscle tone; he had mild lumbar spasm; he had limited range of motion of the lumbar spine; he had normal deep tendon reflexes; his memory was intact; and he had an appropriate mood and affect. (R. at 507-08.) On December 13, 2012, Branham reported that his back pain was relieved with heat and pain medications. (R. at 517-22.) He stated that he was doing well on his medications and that he was pleased with the amount of pain control that he achieved. (R. at 517.) Branham's examination was unchanged. (R. at 520-22.)

On March 12, 2013, Branham reported that pain medication relieved his back and pain. (R. at 489-94.) Branham's examination was unchanged. (R. at 492-94.) On June 13, 2013, Branham reported that his back pain was relieved by lying down and pain medication. (R. at 537-40.) Branham's memory was intact, and his mood and affect were appropriate. (R. at 540.)

On January 7, 2013, Jo McClain, Psy.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating that Branham had no mental impairments. (R. at 70-71.) She noted that the record indicated that Branham had active problems with depression, but that there was no "actual diagnosis on file." (R. at 71.) McClain also noted that Branham did not take any medication for a mental impairment and was not participating in any outpatient counseling. (R. at 71.) She reported that Branham's daily activities did not appear to be limited by a mental impairment. (R. at 71.)

Also, on January 7, 2013, Dr. Michael Hartman, M.D., a state agency physician, completed a medical assessment, indicating that Branham had the residual functional capacity to perform light work. (R. at 72-74.) He opined that Branham could occasionally climb ramps and stairs, stoop, kneel and crouch and never climb ladders, ropes or scaffolds or crawl. (R. at 72-73.) Dr. Hartman opined that Branham was limited in his ability to reach overhead with is right arm. (R. at 73.) No visual or communicative limitations were noted. (R. at 73.) Dr. Hartman opined that Branham should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation and work hazards, such as machinery and heights. (R. at 73.)

On January 16, 2013, Crystal Burke, L.C.S.W., a licensed clinical social worker, saw Branham for complaints of multiple stressors, including financial and family issues. (R. at 458.) Burke reported that Branham was depressed and anxious, but appropriately groomed and displayed no psychosis. (R. at 458.) She diagnosed depressive disorder, not elsewhere classified. (R. at 458.) She noted that "the level of diagnoses or management options of this case is minimal." (R. at 458.) On July 15, 2013, Branham continued to report significant depression and chronic pain. (R. at 563.) Burke reported that Branham had a depressed mood; his thought content was depressed; he displayed problems with concentration; his hygiene and grooming were poor; and he spoke in a monotone voice. (R. at 563.) She diagnosed depressive disorder, not elsewhere classified, and anxiety state, unspecified. (R. at 563.) On August 19, 2013, Branham reported multiple stressors with his health and finances. (R. at 561.) Burke reported that Branham had poor

concentration; his mood was depressed with congruent affect; his thought content was depressed; and his hygiene and grooming were fair. (R. at 561.) Burke diagnosed anxiety state, unspecified; major depressive disorder, recurrent episode, severe without psychotic behavior; and chronic pain. (R. at 562.) She opined that Branham remained disabled from gainful employment. (R. at 561.)

On June 13, 2013, Robert S. Spangler, Ed.D., a licensed psychologist, evaluated Branham at the request of Branham's attorney. (R. at 470-73.) Spangler noted that Branham had awkward gross motor movements and a slow, stiff gait. (R. at 470.) His fine motor skills were age-appropriate, but slow. (R. at 470.) Branham demonstrated erratic concentration, secondary to major depression and discomfort. (R. at 470.) Spangler reported that Branham had adequate recall of remote and recent events; his motor activity was psychomotor retardation; his right hand was swollen; his affect was appropriate; his mood was depressed; his judgment and insight were consistent with low average intelligence; his stream of thought was concrete; his associations were logical; his thought content was nonpsychotic; perceptual abnormalities were not noted, except slowness; and he displayed adequate social skills. (R. at 471-72.) The Wechsler Adult Intelligence Scale - Fourth Edition, ("WAIS-IV"), was administered, and Branham obtained a full-scale IQ score of 74. (R. at 472.) Spangler noted that Branham's perceptual reasoning index score, working memory index score, processing speed index score and full-scale IQ score were considered invalid. (R. at 472.) He reported that these scores were an underestimate of Branham's abilities due to psychomotor retardation for his major depressive disorder and swollen right hand. (R. at 472.) Spangler diagnosed major depressive disorder, recurrent, moderate to severe on

medication, and low average intelligence. (R. at 473.) He assessed Branham's then-current Global Assessment of Functioning, ("GAF"),[12] score at 50[13] to 55.[14] (R. at 473.) Spangler opined that Branham's prognosis was guarded and that he needed to continue mental health treatment for a period to exceed 12 months. (R. at 473.)

Spangler completed a mental assessment,[15] indicating that Branham had a seriously limited ability to follow work rules; to relate to co-workers; to use judgment; to interact with supervisors; to function independently; to maintain attention and concentration; to understand, remember and carry out simple job instructions; and to maintain personal appearance. (R. at 474-76.) He opined that Branham had no useful ability to deal with the public; to deal with work stresses; to understand, remember and carry out complex and detailed job instructions; to behave in an emotionally stable manner; to relate predictably in social situations; and to demonstrate reliability. (R. at 474-75.) Spangler opined that Branham would be absent from work more than four days a month. (R. at 476.)

---

[12] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[13] A GAF score of 41-50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning...." DSM-IV at 32.

[14] A GAF score of 51-60 indicates that the individual has "[m]oderate symptoms... OR moderate difficulty in social, occupational, or school functioning...." DSM-IV at 32.

[15] The assessment is dated June 7, 2013, nearly a week before Branham's evaluation of June 13, 2013. There is no explanation as to why this is dated six days before the date of the evaluation. It is assumed that this is a typographical error. (R. at 476.)

On September 26, 2013, Howard S. Leizer, Ph.D., a state agency psychologist, completed a PRTF, finding that Branham had moderate limitations in his activities of daily living; experienced moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace; and had experienced no repeated episodes of decompensation of extended duration. (R. at 86.)

Leizer also completed a mental assessment, indicating that Branham had moderate limitations in his ability to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to work in coordination with or in proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and to respond appropriately to changes in the work setting. (R. at 90-92.) Leizer found that Branham was not significantly limited in all other work-related areas. (R. at 90-92.) Leizer opined that Branham was capable of performing simple, unskilled work with limited contact with others. (R. at 92.)

On September 30, 2013, Dr. Wyatt S. Beazley, III, M.D., a state agency physician, completed a medical assessment, indicating that Branham had the

residual functional capacity to perform light work. (R. at 88-90.) He opined that Branham could occasionally climb ramps and stairs, stoop, kneel and crouch and never climb ladders, ropes or scaffolds or crawl. (R. at 88-89.) Dr. Beazley opined that Branham was limited in his ability to reach overhead with is right arm. (R. at 89.) No visual or communicative limitations were noted. (R. at 89.) Dr. Beazley opined that Branham should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation and work hazards, such as machinery and heights. (R. at 89-90.)

On February 11, 2014, Branham saw James Kegley, M.S., a counselor, for complaints of depression and anxiety. (R. at 597-616.) Branham stated that he had no prior hospitalizations nor had he been prescribed psychotropic medications. (R. at 597.) Kegley diagnosed major depressive disorder, single episode, moderate, and anxiety disorder, not otherwise specified. (R. at 610.) He assessed Branham's then-current GAF score at 50, with his highest and lowest GAF score being 50 within the past six months. (R. at 610.) On March 31, 2014, Branham reported that he had no energy and that he chose to sleep much of the time. (R. at 591.) Kegley reported that Branham was mildly depressed with a congruent affect. (R. at 591.) On April 22, 2014, Branham reported that he recently went turkey and mushroom hunting. (R. at 589.) He stated that he cared for a horse daily, but was unable to ride it. (R. at 589.) Kegley reported that Branham was mildly depressed with a congruent affect. (R. at 589.) Kegley reported that Branham became frustrated during the session and left prior to possible completion. (R. at 589.) On June 24, 2014, Branham reported that he did not like being around people. (R. at 583.) Kegley reported that Branham moved frequently during the session as if he was in

physical discomfort. (R. at 583.) On July 15, 2014, Branham reported that his depression was getting worse. (R. at 582.) Kegley reported that Branham's mood was mildly to moderately depressed with a congruent affect. (R. at 582.) In August and September 2014, Kegley reported that Branham was mildly depressed with a congruent affect. (R. at 576, 578, 581.) He noted that Branham moved frequently during the session as if he was in physical discomfort. (R. at 576, 578.) In October 2014, Branham reported that he was anxious about his upcoming disability hearing and about a decision in his black lung case. (R. at 573.) Kegley reported that Branham was mildly to moderately depressed with a congruent affect. (R. at 573.) In November 2014, Kegley reported that Branham had a mildly depressed mood with congruent affect. (R. at 571.)

On March 25, 2015, Branham saw Dr. Roy Deel, D.O., to establish medical care. (R. at 10.) Dr. Deel diagnosed central pain syndrome with degenerative disc disease of the lumbar spine; benign prostatic hyperplasia; depression; and generalized anxiety disorder. (R. at 10.) On June 25, 2015, Branham complained of chronic pain and tingling in his arms that radiated from his shoulders into his hands. (R. at 9.) Dr. Deel diagnosed central pain syndrome with degenerative disc disease of the lumbar spine; hypertension; and chronic widespread pain. (R. at 9.) On August 4, 2015, Branham complained of right shoulder pain. (R. at 8.) Dr. Deel reported that Branham had tenderness in the acromioclavicular joint of the right shoulder with decreased range of motion. (R. at 8.) He diagnosed acromioclavicular joint bursitis of the right shoulder and administered a lidocaine injection. (R. at 8.)

## III.  Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2016); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2016).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Branham argues that the ALJ erred by failing to give full consideration to Spangler's findings as to the severity of his mental impairments. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's

Brief"), at 5-6.) Branham also argues that the ALJ erred by failing to give appropriate weight to his testimony and to properly assess the effect of pain on his ability to perform substantial gainful activity. (Plaintiff's Brief at 6-7.)

Branham argues that the ALJ erred by failing to properly weigh the medical evidence of record. (Plaintiff's Brief at 5-6.) In particular, Branham argues that the ALJ should have given the opinion of Spangler controlling weight. (Plaintiff's Brief at 5-6.) It is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4ᵗʰ Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(c), if she sufficiently explains her rationale and if the record supports her findings.

It is well-settled that, in determining whether substantial evidence supports the ALJ's decision, the court must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co.*, 131 F.3d at 439-40. "[T]he [Commissioner] must indicate explicitly that all relevant evidence has been weighed and its weight." *Stawls v. Califano*, 596 F.2d 1209, 1213 (4ᵗʰ Cir. 1979). "The courts … face a difficult task in applying the substantial evidence test when the [Commissioner] has not considered all relevant evidence. Unless the

[Commissioner] has analyzed all evidence and has sufficiently explained the weight she has given to obviously probative exhibits, to say that her decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" *Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977) (quoting *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)).

The ALJ found that Branham had the residual functional capacity to perform simple, routine, repetitive light work that did not require him to crawl or climb ladders, ropes or scaffolds; that did not require more than occasional kneeling, crouching and climbing of ramps and stairs; that did not require him to use his right arm for frequent overhead reaching; that did not involve concentrated exposure to dust, chemicals, fumes, unprotected heights or dangerous equipment; that did not require him to have contact with the public; and that did not require him to have more than occasional interaction with supervisors and co-workers. (R. at 31.) The ALJ stated that she was giving Spangler's opinion "little weight" because it was not supported by the clinical findings of record. (R. at 34.) The ALJ also noted that she was giving Burke's statement that Branham "remains disabled for gainful employment" little weight because it was not supported by the objective clinical findings relative to Branham's mental status. (R. at 34, 561.) The ALJ gave "great weight" to Leizer's assessment in determining that Branham had the residual functional capacity to perform simple, routine, repetitive work involving limited interaction with others. (R. at 33-34, 90-92.)

Dr. Ratliff noted in September, October and November 2012 and in March

and June 2013 that Branham's memory was intact, and he had an appropriate mood and affect. (R. at 450, 494, 499, 508, 540.) In June 2013, Spangler noted that Branham had adequate recall of recent and remote events; he had an appropriate affect and depressed mood; his stream of thought was concrete; his thought content was nonpsychotic; and he had adequate social skills. (R. at 471-72.) In July 2013, Dr. Hilton noted that Branham's insight and judgment were intact. (R. at 754.) The record shows that, in July and August 2013, Burke reported that Branham had a depressed mood, depressed thought content and problems with concentration. (R. at 561, 563.) Burke noted that "[t]he level of diagnoses or management options of this case is minimal." (R. at 458, 563-64.) In September 2013, Leizer found that Branham had moderate limitations in his ability to perform his activities of daily living, in maintaining attention and concentration and in maintaining social functioning and opined that Branham was capable of performing simple, unskilled work with limited contact with others. (R. at 86, 90-92.) Dr. Saado noted on numerous occasions throughout 2013 and 2014 that Branham had a normal mood and affect; he had intact memory; appropriate intellectual functioning; and appropriate thought content and perception. (R. at 627, 630, 634, 637, 641, 643, 646, 653, 656, 773, 783, 791, 798, 807, 816, 823.) The record shows that psychotherapy notes since March 2014 document that Branham was casually dressed and groomed, gave no indication of suicidal or homicidal ideation and was only mildly depressed with congruent affect. (R. at 571, 573, 589, 591.) In January and February 2015, Dr. Saado reported that Branham's memory was intact, he had appropriate intellectual functioning and appropriate thought content and perception. (R. at 783, 791.) Branham reported on numerous occasions that his symptoms of anxiety had improved. (R. at 626, 633, 636, 640, 642, 645, 654, 657.)

Based on this, I find that substantial evidence exists to support the ALJ's weighing of the evidence with regard to Branham's mental residual functional capacity.

Branham also argues that the ALJ erred by failing to give appropriate weight to his testimony and to properly assess the effect of pain on his ability to perform substantial gainful activity. (Plaintiff's Brief at 6-7.) Based on my review of the record, I find that the ALJ considered Branham's allegations of pain in accordance with the regulations. The Fourth Circuit has adopted a two-step process for determining whether a claimant is disabled by pain. First, there must be objective medical evidence of the existence of a medical impairment which could reasonably be expected to produce the actual amount and degree of pain alleged by the claimant. *See Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). Second, the intensity and persistence of the claimant's pain must be evaluated, as well as the extent to which the pain affects the claimant's ability to work. *See Craig*, 76 F.3d at 595. Once the first step is met, the ALJ cannot dismiss the claimant's subjective complaints simply because objective evidence of the pain itself is lacking. *See Craig*, 76 F.3d at 595. This does not mean, however, that the ALJ may not use objective medical evidence in evaluating the intensity and persistence of pain. In *Craig*, the court stated:

> Although a claimant's allegations about [his] pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges [he] suffers....

76 F.3d at 595.

I find that the ALJ reasonably found that Branham's subjective complaints of disabling functional limitations were not credible. (R. at 33.) The ALJ found Branham's statements concerning the intensity, persistence and limiting effects of his symptoms "not entirely credible." (R. at 33.) The ALJ noted that Branham had received only conservative treatment and had not been referred to an orthopedist or neurosurgeon for further evaluation. (R. at 33.) The ALJ also noted that Branham had not sought treatment from a pulmonary specialist since December 2011. (R. at 33.) At that time, Branham stated that he did not wish to pursue any further studies and would manage his condition with inhalers. (R. at 304-06.)

While the diagnostic evidence shows that Branham has degeneration in his neck and back, (R. at 367-68, 373, 427, 434), clinical findings were unremarkable, aside from some tenderness and restricted range of motion. (R. at 626-27, 629-30, 633-34, 636-37, 640-43, 645-46, 653-54, 656-57, 772-73, 781-83, 789-91, 796-98, 804, 806-07, 813, 815-16, 821-23, 828.) In addition, pulmonary clinical findings consistently showed that Branham was in no respiratory distress; he had normal breath sounds; he had good air entry bilaterally that was clear to auscultation, with no wheezes, rhonchi or rales; and unlabored breathing. (R. at 388, 396, 399, 403, 410, 415, 462, 468, 492, 754, 770.) Branham reported in June 2012 that he had to cut wood all year to ensure that his father had wood for the winter. (R. at 394.) In August 2012, Branham reported that he "gets a lot of exercise with his daily activities." (R. at 386.) In April 2014, Branham reported that he recently went turkey and mushroom hunting and that he cared for a horse on a daily basis. (R. at

589.) Branham consistently reported that he tolerated his medications without any issues and that his medications controlled his pain. (R. at 397, 405, 408, 452, 489, 494, 504, 517, 537.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986). Drs. Hartman and Beazley opined that Branham could perform a limited range of light work. (R. at 72-74, 88-90.) The ALJ considered these limitations and included them in her residual functional capacity findings. (R. at 33.) Based on this, I find that the ALJ properly analyzed Branham's allegations of pain.

Based on the above, I find that substantial evidence exists in the record to support the ALJ's finding that Branham was not disabled. An appropriate Order and Judgment will be entered.

ENTERED: September 21, 2017.

s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE